1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WANDA DAVIS,

                        Plaintiff,

v.

THE CITY OF SEATTLE and
JORGE CARRASCO,

                     Defendants.

No. C06-1659Z

ORDER

THIS MATTER comes before the Court on plaintiff's motion for reconsideration concerning materials that have been stricken and on defendants City of Seattle's and Jorge Carrasco's respective motions for summary judgment. Having reviewed all papers filed in support of and in opposition to the motions, and having considered the oral arguments of counsel, the Court does hereby ORDER:

    (1)    Plaintiff's motion for reconsideration, docket no. 241, is GRANTED IN PART and DENIED IN PART;

    (2)    The City of Seattle's motion for summary judgment, docket no. 172, is GRANTED;

    (3)    Jorge Carrasco's motion for summary judgment, docket no. 182, is GRANTED; and

ORDER - 1

1    (4)    The Clerk is directed to enter JUDGMENT consistent with this Order and to

2            send a copy of this Order to all counsel of record.

3    **Background**

4        As an initial matter, the Court notes that plaintiff's submissions in opposition to the

5    motions for summary judgment are voluminous; plaintiff's declaration alone is 81 pages long

6    with 900 pages of exhibits.  Despite their bulk, however, plaintiff's materials lack the

7    specificity necessary to survive a motion for summary judgment.  Indeed, the dearth of detail

8    in plaintiff's response extends to many of the foundational facts, and the Court has been

9    forced to resort to the Second Amended Complaint simply to understand the chronology of

10   events.  To support her arguments, plaintiff has consistently relied upon inadmissible

11   hearsay, misinterpretations of written materials and deposition testimony, or just shear

12   speculation.  She has offered no statistical analysis on which to base her claim that she has

13   been treated less favorably than those outside her protected class, and she has failed to draw

14   the requisite link between her gender, sexual orientation, or protected activities and the

15   decisions made by Seattle City Light and Jorge Carrasco.  In sum, notwithstanding the

16   mountainous record, plaintiff fails to identify any genuine issue of material fact that would

17   preclude summary judgment.

18        **1.    Plaintiff's Employment History**

19       Plaintiff Wanda Davis is a homosexual woman who works for Seattle City Light, an

20   electric utility owned by the City of Seattle.  In this lawsuit, she alleges disparate treatment

21   on the basis of gender and sexual orientation, hostile work environment, and retaliation

22   under both state and municipal law.  She also asserts claims under 42 U.S.C. § 1983.

23   Plaintiff was hired by Seattle City Light in 1985.  Davis Decl. at ¶ 2 (docket no. 191).  She

24   began an apprenticeship program in 1989, *id.* at ¶ 11, and was promoted to journey worker in

25   1995, *see* Second Amended Complaint at ¶ 2.4 (docket no. 221).

26

In 1994, plaintiff brought suit in King County Superior Court against the City of Seattle and Gary Young, a journey-level co-worker, alleging sexual harassment, retaliation, negligent supervision, civil assault, battery, intentional and/or negligent infliction of emotional distress, breach of contract, and negligent and/or reckless causation of severe anxiety. Exh. A to Overbey Decl. (docket no. 178); *see* Davis Decl. at ¶ 16. The matter was resolved by settlement, pursuant to which plaintiff "completely release[d] and forever discharge[d] any demands, obligations, actions, causes of action, rights, damages, . . . and any compensation of any nature whatsoever, . . . which the plaintiff now has, and/or which are the subject of the complaint." Exh. A to Overbey Decl. The Settlement Agreement and Release was executed on December 22, 1995.[1] *Id.*

Less than two years later, in August 1997, plaintiff was promoted to crew chief of the Electrical Shop. Second Amended Complaint at ¶ 2.7 (docket no. 221). Within approximately one year, plaintiff applied for a promotion to Shop Manager. Davis Dep. at 13:14-19, Exh. B to Overbey Decl. (docket no. 178). The panel conducting interviews for the Shop Manager position was composed of Deputy Superintendent Jesse Krail,[2] Pamela Smith-Graham, and Mike Bruno. *Id.* at 13:15-16. At that time, Ms. Smith-Graham was a director at Seattle City Light, who reported to Deputy Superintendent Krail and who supervised the Shop Manager; Mr. Bruno apparently occupied a peer-level manager position.

[1] The City of Seattle contends, and plaintiff does not appear to dispute, that plaintiff is barred from seeking remedies for events occurring and/or claims arising before the December 1995 settlement. *See* Motion for Summary Judgment at 13-14 (docket no. 172); *see also* Response at 35 (docket no. 199) (plaintiff's claim accrues, "for liability purposes, once she settles her first discrimination law suit"). In both the response brief and her declaration, however, plaintiff discusses in detail the interactions she had with Gary Young. Although the fact that plaintiff previously brought suit and received compensation from the City of Seattle might be relevant to her current claims of retaliation, the unproven allegations that culminated in settlement are not properly before the Court. *See* Fed. R. Evid. 408 (evidence about a settlement is not admissible to prove liability as to disputed claim, but may be used for other purposes, including establishing bias or prejudice).

[2] In her declaration, plaintiff complains that, during the interview process, Deputy Superintendent Krail "belittled" her answers to questions and tried to humiliate and embarrass her. Davis Decl. at ¶ 35 (docket no. 191). Plaintiff, however, offers no details, no indication that any boorish behavior was related to her gender, sexual orientation, or previous litigation, and no reason for concluding that she was treated in interviews differently than other candidates.

ORDER - 3

1    *Id.* at 14:7-8; *see* Second Amended Complaint at ¶ 2.7; *see also* Smith-Graham Dep. at

2    70:19-22, Sheridan Decl. at 284 (docket no. 193); *compare* Organization Chart dated

3    October 1999, Sheridan Decl. at 136.  Joe Bell, who had previously worked at Hanford, was

4    the successful candidate for the Shop Manager position, and was employed by Seattle City

5    Light from October 1998 through March 2005.  Bell Dep. at 7:21, 8:1-5, Exh. C to Overbey

6    Decl.

7           After Mr. Bell's selection as Shop Manager, and therefore as plaintiff's immediate

8    supervisor, Mr. Bell authored at least two written evaluations of plaintiff; plaintiff offered no

9    objection to the evaluation for 1999, and she did not view the evaluation for 2000 as

10   discriminatory.  Davis Dep. at 505:14-25, 506:25, 512:17-20, Exh. B to Overbey Decl.

11   (docket no. 178).  Plaintiff, however, wrote on the latter document, under "Employee

12   Comments," that she "would like to have the manager communicate information from other

13   sources related to electrical work and utility to crew chief."  Davis Dep. at 512:1-7, Exh. B

14   to Overbey Decl.  In her deposition, plaintiff explained that she made this notation because

15   "Joe Bell did not communicate well information related to my group to me.  If he had

16   information[,] he kept it to himself . . . .  He also would go to my subordinates for

17   information instead of going through me . . . ."  *Id.* at 512:9-13.

18          In January 2001, Mr. Bell prepared a memorandum confirming a verbal warning

19   issued to plaintiff concerning members of her crew watching television during their shifts.

20   Davis Decl. at 134 (docket no. 191).  The document, which was placed in plaintiff's

21   personnel file, indicated that Mr. Bell personally observed the activity on September 7, 2000,

22   and subsequently instructed Ms. Davis to have the television removed from the lunch/break

23   room.  *Id.*  The memorandum further recited that, when Mr. Bell inquired about the status of

24   the television during plaintiff's annual appraisal meeting in late December 2000, plaintiff

25   responded that, based on a recent ethics training, she concluded crew members were

26   permitted to watch during breaks and she therefore "had no authority" to remove the

ORDER - 4

1  television.  *Id.*  In the concluding paragraph, Mr. Bell described plaintiff's behavior as

2  insubordinate, made clear his expectation that the television be promptly removed, and

3  warned plaintiff that similar failures to follow instructions would lead to disciplinary action.

4  *Id.*

5       At some point, plaintiff complained via e-mail to Ms. Smith-Graham's "boss"

6  (presumably Deputy Superintendent Krail) that "there were issues with Joe Bell."  Smith-

7  Graham Dep. at 51:24-52:1, Exh. D to Overbey Decl. (docket no. 178).  Ms. Smith-Graham

8  investigated the matter and concluded that "Joe Bell had a different managing style than

9  employees are used to at Seattle City Light."  *Id.* at 53:22-25.  According to Ms. Smith-

10  Graham, Mr. Bell did not seek as much consensus and provided less information to

11  employees concerning why he made certain decisions than was the norm within the

12  organization.  *Id.* at 54:1-2.  Based on interviews of Mr. Bell's subordinates, Ms. Smith-

13  Graham formed the belief that "things were improving significantly and they felt Joe was

14  doing a good job and they could work well with him."  *Id.* at 54:7-9.  In addition, however,

15  Ms. Smith-Graham came to the opinion that plaintiff would benefit from not reporting to

16  Mr. Bell.  *Id.* at 54:19-20.

17       Therefore, in July 2001, plaintiff voluntarily transferred to Seattle City Light's South

18  Substation, where she maintained the position of crew chief.  *See* Second Amended

19  Complaint at ¶ 2.13 (docket no. 221) (plaintiff "became crew chief at South Substation to

20  advance her career").[3]  Shortly thereafter, plaintiff sent a memorandum to Deputy

21  Superintendent Krail, in which she provided her version of the events involving the

22  television in the lunch/break room and requested that the confirmation of verbal warning be

23  _____

24  [3] In contrast to the allegation in her pleadings, in her declaration, plaintiff asserts that Ms. Smith-Graham
    threatened and coerced her into transferring to the South Substation.  Davis Decl. at ¶¶ 53-55 (docket no. 191).

25  She also contends that the transfer resulted in a loss of income because overtime was allotted in a different
    manner at the South Substation than in the Electrical Shop.  *Id.* at ¶ 57.  Plaintiff, however, acknowledged in
    her deposition that, under the terms of the applicable collective bargaining agreement, Ms. Smith-Graham could

26  not have transferred plaintiff from the Electric Shop to the South Substation without plaintiff's consent.  Davis
    Dep. at 191:5 & 192:12-13, Exh. B to Overbey Decl. (docket no. 178).

removed from her personnel file.[4]  Memorandum dated August 8, 2001, Davis Decl. at 147-49 (docket no. 191).  Subsequently, at a Distribution Branch directors meeting, Deputy Superintendent Krail and the directors then present, including Ms. Smith-Graham, decided not to remove documents from any employee's personnel file.  *See* Smith-Graham Dep. at 65:4-10, Sheridan Decl. at 279 (docket no. 193).  According to Ms. Smith-Graham, plaintiff's name was not mentioned when the new policy was proposed or adopted, and the matter was placed on the directors meeting agenda in connection with an unrelated "network" personnel issue.  *Id.* at 66:11-13 & 72:5-9.

Approximately a year later, during the summer of 2002, plaintiff sought promotion to the position of Supervisor of South Stations.  *See* Davis Decl. at ¶ 61 (docket no. 191); Second Amended Complaint at ¶ 2.17 (docket no. 221).  Besides plaintiff, the candidates for the position included Paula Rose and Paul Weintraub.  Smith-Graham Dep. at 87:22-88:8, Exh. D to Overbey Decl. (docket no. 178).  At the time, Mr. Weintraub was the Executive Assistant to Ms. Smith-Graham; Ms. Smith-Graham participated in the interview process.  *Id.* at 59:4-10 & 87:22-24.   Ultimately, Paula Rose was selected for the position based in part on her "electrical and field knowledge and experience."  *Id.* at 88:9-25.

In her declaration, plaintiff alleges that Ms. Smith-Graham chose Ms. Rose over plaintiff in retaliation for plaintiff's 1994 lawsuit.  *See* Davis Decl. at ¶ 62 (docket no. 191). As support, plaintiff references testimony by Mr. Weintraub in which he expressed his personal distrust of plaintiff and his belief that, after Gary Young was disciplined for his behavior toward plaintiff, plaintiff's lawsuit against Mr. Young "was going beyond what she needed to do."  Weintraub Dep. at 24:9-13, Sheridan Decl. at 312 (docket no. 193).  Plaintiff contends that Ms. Smith-Graham was influenced by Mr. Weintraub's views.  *See* Davis

---

[4] Attached to plaintiff's memorandum was an undated, unsworn, one-sentence letter signed by members of the Electrical Shop crew, stating that "at no time has Joe Bell . . . ever caught any member of this crew collectively or individually watching television during company time."  Davis Decl. at 150 (docket no. 191).  The letter, as well as plaintiff's reference to it in her declaration, have previously been stricken as constituting inadmissible hearsay and lacking proper authentication.  Minute Order (docket no. 239).

1    Decl. at ¶ 62.  Plaintiff, however, offers no evidence to support this assertion.  In contrast,

2    the City of Seattle has proffered a declaration in which Mr. Weintraub explained that, during

3    his employment at Seattle City Light (he retired in 2006), he was aware of the impropriety of

4    retaliating against a person who files an employment discrimination complaint, and he knows

5    of no instance of such retaliation against plaintiff.  Weintraub Decl. at ¶ 3 (docket no. 212).

6    Mr. Weintraub further clarified that he provided no input to Ms. Smith-Graham concerning

7    the selection in 2002 of a South Stations Supervisor (for which he was a candidate), he does

8    not recall discussing with Ms. Smith-Graham the lawsuit plaintiff filed against Mr. Young,

9    and he does not know whether or not Ms. Smith-Graham shares his opinions of plaintiff.  _Id._

10   at ¶ 4.  Mr. Weintraub's declaration corroborates Ms. Smith-Graham's deposition testimony,

11   during which she indicated that she had never expressed to Mr. Weintraub a general distrust

12   of plaintiff, that she did not feel resentment toward plaintiff based on "her past," and that she

13   would not have hesitated to promote plaintiff if plaintiff was the successful candidate.  _See_

14   Smith-Graham Dep. at 125:8-10 & 126:11-23, Sheridan Decl. at 292-93.

15       After her unsuccessful bid for promotion, plaintiff began reporting to Paula Rose.

16   During that same summer of 2002, Karl Horne was assigned to plaintiff's crew as an

17   apprentice, when he was in the second year of the four-year program.  Report by Kathleen

18   O'Hanlon dated June 6, 2005, Davis Decl. at 883 n.4 & 884 (docket no. 192).  While an

19   apprentice, Mr. Horne worked alongside three journey-level members of plaintiff's crew:

20   Tim Darrochmannix, Ron Swanson, and Heather Talbot.  _Id._ at 884.  Shortly after Mr. Horne

21   began his rotation, Mr. Darrochmannix was promoted to Electrical Shop crew chief

22   (plaintiff's prior position),[5] and Mr. Swanson, after taking a leave, transferred to the

23   Electrical Shop.  _Id._ at 884; Davis Decl. at ¶ 66 (docket no. 191).  During this same time,

24

---

25   [5] In her declaration, plaintiff describes Mr. Darrochmannix's promotion as the "ultimate emotional slam by
     management."  Davis Decl. at ¶ 67 (docket no. 191).  Plaintiff, however, does not appear to contend that she
26   was personally disadvantaged by Mr. Darrochmannix's promotion or that the promotion itself constitutes any
     evidence of discrimination based on gender or sexual orientation.

ORDER - 7

1    Ms. Talbot displayed unstable behavior, having "disruptive tantrums" and "mood swings."

2    Davis Decl. at 884; Davis Decl. at ¶ 59; _see_ Stephanie Lieberman interview of Karl Horne

3    dated April 6, 2005, Davis Decl. at 869.  Mr. Horne requested and was granted an early

4    transfer to a different substation.  Davis Decl. at 884.  Before rotating, however, Mr. Horne

5    received an unfavorable written evaluation signed by Ms. Talbot and Mr. Swanson.  _Id._ at

6    884-85; Davis Decl. at ¶ 70.  Mr. Horne later learned that plaintiff had drafted the

7    evaluation.[6]  _See_ Davis Decl. at 885.  Plaintiff alleges that she ghost-authored the evaluation

8    based on advice from Paula Rose, and that she put a hand-written comment on the document,

9    expressing her hope that Mr. Horne "had a better time on the next crew," but her signature

10   was somehow subsequently removed by someone.  Davis Decl. at ¶ 70.  Mr. Horne did not

11   contemporaneously protest the evaluation.  Davis Decl. at 885; Davis Decl. at ¶ 70.

12       In January 2004, plaintiff applied for the position of Construction and Maintenance

13   Supervisor.  Second Amended Complaint at ¶ 2.19 (docket no. 221); _see also_ Crutchfield

14   Decl. at ¶ 2 (docket no. 174).  Plaintiff was one of nine preliminary candidates and the only

15   woman applicant.  Exhs. A & B to Crutchfield Decl.  After the first round of interviews

16   before a six-person panel, plaintiff was selected as one of five finalists.  _Id._  The second

17   round of interviews was conducted by John Harris and Rod Siverson.[7]  Exh. A to Crutchfield

18   Decl.  Based on this process, two male candidates received offers; both scored higher than

19   plaintiff on the ratings assigned by the initial panel of six, and both men were assigned better

20   marks by John Harris based on their responses to standard questions asked of each candidate.

21   Crutchfield Decl. at ¶ 3 & Exh. B (averages of H+ and H, respectively, compared with H-);

22   Harris Decl. at ¶ 2 & Exhs. A, B, & C (docket no. 175).  Rod Siverson's rating sheets have

23

24   [6] Both Ms. Talbot and Mr. Swanson apparently disagreed with the evaluation.  Ms. Talbot subsequently told
     an investigator that she signed the evaluation because she felt "coerced" and "intimidated" into doing so by
25   plaintiff; Mr. Swanson attempted to distinguish his own positive experiences with Mr. Horne by adding a
     favorable hand-written comment next to his signature.  _See_ Davis Decl. at 890-91 (docket no. 192).

26   [7] The parties have not indicated whether Messrs. Harris and Siverson stood in a supervisory or a peer capacity
     to the position for which plaintiff applied.

ORDER - 8

1  not been provided, but transcripts have been offered indicating that, in his deposition,

2  Mr. Siverson testified he has never heard from any source that plaintiff is homosexual.

3  Siverson Dep. at 11:21-12:1, Exh. K to Overbey Decl. (docket no. 178).  Plaintiff was

4  advised via letter dated April 23, 2004, in the same form as sent to the other two

5  unsuccessful applicants, that she had not been selected for the position.  Exh. C to

6  Crutchfield Decl.

7          Around the same time, in late April 2004, plaintiff learned that Karl Horne was being

8  reassigned to her crew.  Davis Decl. at 885 (docket no. 192); Davis Decl. at ¶ 83 (docket

9  no. 191).  At that time, Paul Weintraub was the Acting Supervisor of South Stations,

10  temporarily serving in the position while Paula Rose was on another assignment.  Weintraub

11  Dep. at 8:8-16, Exh. L to Overbey Decl. (docket no. 178); Davis Decl. at 886; Davis Decl. at

12  ¶ 83.  In her declaration, plaintiff alleges that Mr. Weintraub instructed her to conduct an

13  expectations meeting with Mr. Horne in advance of his rotation.  Davis Decl. at ¶¶ 83-84.

14  Mr. Weintraub, however, testified in his deposition that plaintiff approached him with the

15  plan of talking to Mr. Horne.  Weintraub Dep. at 11:13-19, Exh. L to Overbey Decl.

16  Plaintiff indicated to Mr. Weintraub that she would bring along Edward Richards, who had

17  been on plaintiff's crew since the fall of 2002.  *Id.* at 11:22; *see* Richards Decl. at ¶¶ 13-14

18  (docket no. 194).  According to Mr. Weintraub, after plaintiff presented her idea, he said it

19  "sounded okay."  Weintraub Dep. at 11:23-24, Exh. L to Overbey Decl.

20          Plaintiff and Mr. Richards subsequently traveled to the Shoreline Substation, where

21  Mr. Horne was then working, and met with Mr. Horne in private.  Davis Decl. at ¶ 85

22  (docket no. 191).  They apparently discussed *inter alia* Mr. Horne's ability to tolerate

23  diversity, particularly sexual orientation.  *See* Richards Decl. at ¶ 16 (docket no. 194); Davis

24  Decl. at ¶ 85; *see also* Davis Decl. at 870 (docket no. 192).  Shortly thereafter, Mr. Horne

25  accused plaintiff of discrimination.  *See* Report by Kathleen O'Hanlon, Davis Decl. at 879.

26  After an investigation begun by Stephanie Lieberman, Seattle City Light's Equal

Employment Opportunity ("EEO") Coordinator until December 31, 2005, and completed by

Kathleen O'Hanlon, an attorney with Marcella Fleming Reed PLLC, plaintiff was exonerated

as to the discrimination claim, but was found in violation of workplace expectations.  *See*

Report by Kathleen O'Hanlon, Davis Decl. at 896.  Ms. O'Hanlon concluded that plaintiff

(i) "departed from standard practice and procedure in preparing and executing Mr. Horne's

evaluation after his first rotation to her substation," (ii) "obtained Mr. Weintraub's consent[8]

to the expectations meeting under false pretenses," and (iii) "inappropriately singled out" and

subjected Mr. Horne to embarrassment by conducting an "unprecedented" expectations

meeting in advance of a rotation.  Davis Decl. at 881, 894.  Plaintiff was subsequently

suspended from work for two days.[9]  Davis Decl. at 252-55.

---

[8] When interviewed by Ms. O'Hanlon, Mr. Weintraub indicated that the day plaintiff asked him about conducting the expectations meeting with Karl Horne was extremely busy.  Davis Decl. at 126 (docket no. 191).  Plaintiff told Mr. Weintraub that she would be on vacation during the first two weeks of Mr. Horne's rotation, and that she "felt it would be unfair" to pass "these issues" along to Ed Richards, who would be performing her duties in her absence.  *Id.* at 124.  At the time, Mr. Weintraub did not give much thought to plaintiff's suggestion, but in hindsight, he regretted not being "more alert to the possible negative outcome."  *Id.* at 125-26.  Mr. Weintraub told Ms. O'Hanlon that he "could not remember [previously] scheduling an expectations meeting in advance of an apprentice's arrival" and that, "[h]ad he thought about it for five minutes, [he] would have come up with another solution to this issue."  *Id.* at 124, 126.

[9] Karl Horne filed his complaint against plaintiff on June 11, 2004.  Exh. A to O'Hanlon Decl. (docket nos. 177 & 185-3).  In March 2005, Ms. O'Hanlon was retained to investigate the matter, and she completed her report on June 6, 2005.  O'Hanlon Decl. at ¶¶ 2 & 3.  In August 2005, plaintiff was advised of proposed disciplinary action, and a *Loudermill* hearing was conducted on October 28, 2005.  *See* Davis Decl. at 252 (docket no. 191); *see also* Exh. K to Andrade Decl. (docket no. 173).  In March 2006, Superintendent Jorge Carrasco advised plaintiff via memorandum mailed to her home that she would be suspended for two days effective March 16, 2006.  Davis Decl. at 252-56.  In her declaration, plaintiff complains about the amount of time between the filing of Mr. Horne's complaint and completion of the investigation.  Davis Decl. at ¶ 90.  Plaintiff appears to contend that the delay was due to discriminatory treatment of Seattle City Light's then EEO Coordinator, Stephanie Lieberman.  *Id.* at ¶ 91.  According to Ms. Lieberman, she was overwhelmed by the quantity of complaints and suffered a nervous breakdown in the fall of 2004.  Lieberman Dep. at 8:1-25, Sheridan Decl. at 334 (docket no. 193).  Ms. Lieberman theorized that her predecessor, Cheryl Angeletti Harris, was not held in high regard by women and persons of color, who therefore did not express complaints to her; when Ms. Lieberman assumed the EEO Coordinator position, the number of cases increased significantly and she could not keep pace.  *Id.* at 8:14-21.  She did not have clerical support and was not permitted to work overtime.  *Id.* at 8:3-4.  After her attorney indicated that the open area in which her office was located made doing her job impossible due to the lack of privacy and constant interruptions, Ms. Lieberman was assigned a tiny windowless office and restricted from checking her voicemail and e-mail more than once per day.  *Id.* at 20:4-22, Sheridan Decl. at 336.  At some point, the City of Seattle began hiring outside consultants to conduct the investigations Ms. Lieberman had not completed.  Lieberman Dep. at 21:17-23, Exh. Q to Overbey Supp. Decl. (docket no. 207).  In a deposition taken in connection with a different case, Ms. Lieberman acknowledged

1    While the internal complaint filed by Karl Horne was under investigation,[10] Jorge

2    Carrasco became the Superintendent of Seattle City Light.   *See* Carrasco Dep. at 5:20-24,

3    Exh. F to Overbey Decl. (docket no. 178).   In addition, Bill Ivie became the Acting Stations

4    Constructor and Maintenance Supervisor, a position he held from November 2004 until July

5    2006, when he retired from Seattle City Light.   Report at 2, Exh. C to Andrade Decl. (docket

6    no. 173); West Decl. at ¶ 4 (docket no. 213).   As Stations Supervisor, the position previously

7    occupied by Paula Rose (and temporarily by Paul Weintraub), Mr. Ivie oversaw Core Groups

8    4 and 5.   Report at 2 & 3, Exh. C to Andrade Decl.   Each Core Group was comprised of

9    three substations; the South Substation, at which plaintiff was the crew chief, was within

10   Core Group 5, which was headed by Frank Young.   Report at 2 & n.1, Exh. C to Andrade

11   Decl.; *see also* Organizational Chart dated December 2, 2005, Exh. B to Andrade Decl.

12   ──────────────────────

13   that she was "ineffective in writing reports," *id.* at 50:9-10, and she indicated that she negotiated a leave with
     compensation and benefits in lieu of termination for cause ("being fired"), but she never instituted legal action

14   or filed a complaint of any kind against the City of Seattle, *id.* at 5:20-25, 6:3-5.   In connection with a previous
     motion for protective order, the City of Seattle presented the declaration of Ms. Lieberman's supervisor,

15   Beatrice Hughes, who indicated that, in December 2004, Ms. Lieberman was suspended for three days due to
     her inadequate performance, having completed only five reports during the 22 ½ months she had been the EEO

16   Coordinator.   Hughes Decl. at ¶¶ 2 & 4 (docket no. 143).   In her declaration, Ms. Hughes averred that she
     counseled Ms. Lieberman several times about the need to more rapidly complete investigations, but Ms.

17   Lieberman's performance did not improve.   *Id.* at ¶¶ 4-5.   In her deposition, Ms. Lieberman agreed that she had
     been advised to reduce the amount of time devoted to each investigation, but she denied receiving any pressure

18   from management to make findings favorable to Seattle City Light.   Lieberman Dep. at 9:2-5, Sheridan Decl. at
     335.   The record suggests that the delay in investigating Mr. Horne's complaint against plaintiff was due solely

19   to Ms. Lieberman's performance issues; however, even if the hold up resulted from poor treatment of
     Ms. Lieberman, plaintiff offers no evidence that Ms. Lieberman was discriminated against on the basis of her

20   membership in a protected class or that the time lag plaintiff experienced was longer than typical during Ms.
     Lieberman's tenure.

21   [10] Plaintiff alleges that, because of the then pending investigation, she was prohibited from receiving a Seattle

22   Works award for outstanding leadership.   Second Amended Complaint at ¶ 2.30 (docket no. 221); Davis Decl.
     at ¶ 108 (docket no. 191).   During Ms. O'Hanlon's investigation, plaintiff used this ineligibility for both the

23   Seattle Works award and a Light Power & Pride award to claim that Karl Horne's complaint against her was a
     form of harassment having financial repercussions.   Report at 2 n.1, Exh. A to O'Hanlon Decl. (docket nos.

24   177 & 185-3).   Ms. O'Hanlon, however, observed that plaintiff was otherwise not an appropriate candidate for
     the Light Power & Pride award due to her membership on the Light Power & Pride Committee.   *Id.*   Ms.

25   O'Hanlon further opined that a policy of disqualifying employees from receiving awards while under
     investigation is not unreasonable or discriminatory.   *Id.*   Indeed, plaintiff offers no evidence that she was

26   precluded from receiving any award due to her gender, sexual orientation, or protected activities.   Likewise,
     plaintiff fails to present any facts to show that the policy at issue was applied in a discriminatory or retaliatory
     manner.

ORDER - 11

During the time he was Acting Stations Supervisor, Mr. Ivie's regular post was Crew Chief of the Canal Substation; he reported to Michael Korling, then the Acting Manager of Power Stations.  Report at 2, Exh. C to Andrade Decl.

On January 13, 2006, plaintiff filed a complaint against Bill Ivie, alleging that he discriminated against her on the basis of gender and disability in making overtime and out-of-class ("OOC") assignments.  Exh. A to Andrade Decl. (docket no. 173).  Plaintiff also claimed that Mr. Ivie yelled at her on more than one occasion, thereby creating a hostile work environment.  _Id._  After investigation by Branda Andrade, the Equal Employment Opportunity and Diversity Manager for Seattle City Light, Mr. Ivie was found not to have discriminated against plaintiff on the basis of disability[11] or gender, but was determined to have violated workplace expectations by communicating with plaintiff in a disrespectful manner.  _See_ Report dated July 31, 2006, Exh. C to Andrade Decl. (docket no. 173).  Based on a review of overtime records, Ms. Andrade concluded plaintiff's claim that Mr. Ivie favored Core Group 4 over Core Group 5 in distributing overtime was unsubstantiated.  _Id._ at 4.  Moreover, during Mr. Ivie's supervision, plaintiff received 618 hours of overtime, which was more than the average per employee in either Core Group during the same period.  _Id._ at 5.  With regard to out-of-class assignments, Ms. Andrade found that plaintiff was at the statistical mean, receiving more assignments than two, and less than two, male counterparts.  _Id._ at 6.  For purposes of comparison, Ms. Andrade evaluated the out-of-class assignments for other crew chiefs, opining that journey-level workers had different (and more) out-of-class opportunities and were not similarly situated.  _Id._ at 6 n.8.  Finally, Ms. Andrade concluded that Mr. Ivie was an equal opportunity verbal abuser, yelling and displaying angry

---

[11] From October 13, 2005, until January 25, 2006, plaintiff was medically restricted from repetitive use of her left hand and wrist.  Report at 13, Exh. C to Andrade Decl. (docket no. 173).  During this period, plaintiff was denied overtime to "pull cable," an activity that "requires repetitive use of the wrists and hands."  _Id._  After presenting to Seattle City Light a release from her medical provider, plaintiff returned to full duty status, _id._ at 11 & 13, and she has not claimed discrimination on the basis of disability in this lawsuit, _see_ Second Amended Complaint (docket no. 221).

ORDER - 12

1   behavior at men and women alike.  *Id.* at 8-10.  Thus, although Mr. Ivie was deemed not to

2   have created a gender-hostile work environment, his communication style was found lacking.

3   *Id.*

4        Due to Mr. Ivie's retirement, and the expectation that Mr. Ivie would not return as a

5   consultant or the like, no discipline was imposed.  West Decl. at ¶ 4 (docket no. 213).

6   According to Jean West, Human Resources Officer for Seattle City Light, the conclusion that

7   discipline was moot was reached without any involvement from Superintendent Carrasco.

8   *Id.*; *see also* Carrasco Decl. at ¶ 7 (docket no. 209) ("I have not been involved in any

9   discussion of possible discipline against Bill Ivie . . . .").  In her complaint and her

10  declaration, plaintiff accuses Ms. Andrade of deliberately delaying the investigation to allow

11  Mr. Ivie to retire without disciplinary action.  *See* Second Amended Complaint at ¶ 2.43

12  (docket no. 221); Davis Decl. at ¶ 138 (docket no. 191).  Contrary to plaintiff's assertion,

13  however, Ms. Andrade's file memorandum, to which plaintiff cites for sole support, does not

14  indicate that she knew the exact date on which Mr. Ivie planned to retire; rather, she simply

15  noted that Mr. Ivie intended to retire when his wife, Elisabeth ("Betty") Tobin, Ph.D., P.E.,

16  retired.[12]  Davis Decl. at 285.

17       In November 2006, Seattle City Light received an anonymous written complaint

18  alleging that plaintiff and Mr. Richards enabled a non-employee to enter the South

19  Substation and practice for an upcoming apprenticeship working test.  Exh. D to Andrade

20  Decl. (docket no. 173).  An investigation was performed by Colleen Kinerk, an attorney and

21  partner in the firm of Cable, Langenbach, Kinerk & Bauer, LLP.  Andrade Decl. at ¶ 9 &

22  Exh. E.  The decision to use Ms. Kinerk's services was based in part on plaintiff's pending

23  litigation and her assertion therein that Ms. Andrade, who otherwise would have conducted

24  _____

25  [12] Dr. Tobin appears to have retired earlier than anticipated, having been required after Superintendent
    Carrasco's arrival to reapply (unsuccessfully) for her director-level position, having complained
    (unsuccessfully) about gender-based discrimination by Superintendent Carrasco, and having negotiated a

26  Separation Agreement and Release, facilitating her retirement effective no later than September 5, 2006.  Exh.
    W to Overbey Supp. Decl. (docket no. 207); Davis Decl. at 311-15 (docket no. 191).

ORDER - 13

1   the investigation, was biased and unqualified.  *Id.* at ¶ 8.  Ms. Kinerk was selected because

2   she is highly regarded and had not previously worked for the City of Seattle or Seattle City

3   Light.  *Id.* at ¶ 9; *see also* Andrade Decl. at ¶ 8 (docket no. 140) (in support of motion for

4   protective order).

5          In December 2006, Ms. Kinerk submitted a 22-page report, opining that plaintiff and

6   Mr. Richards had violated safety protocols, workplace expectations, and ethics standards.

7   *See* Letter Report dated December 29, 2006, Exh. F to Andrade Decl. (docket no. 173).

8   Ms. Kinerk summarized the undisputed facts as follows.  Aaron Duvall is plaintiff's

9   daughter's boyfriend.  *Id.* at 4.  During the time in question, he was seeking acceptance into

10  Seattle City Light's apprenticeship program.  *Id.*  As part of the application process, he was

11  required to take a "working test."  *Id.* at 11.  The test took place on October 11, 2006, at the

12  Canal Substation.  *Id.* at 6 n.6.  Mr. Duvall did not perform well enough to continue as a

13  candidate for the apprenticeship program.  *Id.*  Sometime prior to the test, however, plaintiff

14  assisted Mr. Duvall in gaining access to the South Substation.  *Id.* at 4.  During this visit,

15  without prior approval or authorization from plaintiff's or Mr. Richards's superiors,

16  Mr. Duvall was suited in a harness and allowed to ascend and descend a steel structure in the

17  South Substation yard.  *Id.*

18         During her interview by Ms. Kinerk, plaintiff alleged that Mr. Richards was the

19  person who suggested that Mr. Duvall should climb the steel structure.  *Id.* at 5.  When

20  Ms. Kinerk interviewed Mr. Richards, however, he indicated that plaintiff expressly

21  requested him to provide help to Mr. Duvall.  *Id.* at 6.  Mr. Richards, described by a co-

22  worker as a person who "observes the chain of command," *id.* at 8, selected a harness for

23  Mr. Duvall, provided safety instructions, and proceeded up the steel structure in front of

24  Mr. Duvall.  *Id.* at 6.  Once on the structure, Mr. Richards encouraged Mr. Duvall to

25  simulate the use of binoculars, release his grip, and rely on the harness to hold him.  *Id.*

26

1   Regardless of who encouraged Mr. Duvall to climb the structure, while he engaged in the

2   activity, plaintiff undisputedly served as the "safety watch person" on the ground.[13] _Id._ at 7.

3        Based on interviews of plaintiff, Mr. Richards, and four other employees present at

4   the South Substation at the time in question, as well as the person responsible for

5   administering the apprenticeship working tests, a recruiting and outreach coordinator, and a

6   safety specialist for Seattle City Light's south end, Ms. Kinerk concluded that permitting a

7   non-employee to enter a restricted and potentially dangerous work site, without prior

8   approval of a supervisor, and then climb a steel structure was a violation of safety protocols

9   concerning which plaintiff and Mr. Richards had, contrary to their denials, received

10  sufficient training. _Id._ at 15-20.  Moreover, the type and level of assistance provided to

11  Mr. Duvall was of a nature intended to confer an advantage over other candidates taking the

12  apprenticeship working test, and therefore constituted a breach in fact and in appearance of

13  the City of Seattle's ethics standards.  _Id._ at 20-22.

14        In February 2007, plaintiff was advised of proposed disciplinary action, namely

15  demotion and a one-year prohibition on supervisory out-of-class assignments.  Davis Decl. at

16  541-43 (docket no. 192).  Following plaintiff's and Mr. Richards's submission of materials

17  in response to Ms. Kinerk's report, Ms. Kinerk was asked to make additional inquiries and

18  provide a supplemental report.  _See_ Davis Decl. at 548.  Ms. Kinerk interviewed five current

19  crew chiefs and one former crew chief, as well as six individuals who were involved in

20  security, training, or recruiting for Seattle City Light.  _See_ Supplemental Letter Report dated

21  June 18, 2007, Exh. G to Andrade Decl. (docket no. 173).  Ms. Kinerk made the following

22  findings.  No crew chief believed that he or she had authority to permit a non-employee to

23  access a substation.  _Id._ at ¶ II.B.1.  In addition, the consensus among crew chiefs was that

24

25  _____

    [13] In her declaration, plaintiff admits that she allowed Mr. Duvall to enter the South Substation, as well as the
    work area or yard, but asserts that Mr. Richards asked Mr. Duvall if he wanted to try on a harness.  Davis
26  Decl. at ¶ 167 (docket no. 191).  Plaintiff also concedes that, with Mr. Richards's assistance, Mr. Duvall
    climbed a ladder and leaned back in the harness "hands free," while plaintiff acted as the "ground person."  _Id._

1   they would not have allowed a non-employee to enter a substation to climb a structure.  *Id.* at

2   ¶ II.B.7.  One crew chief opined that, had he done so, "he would have been fired."  *Id.* at 14.

3         Based on the reports prepared by Ms. Kinerk, and after reviewing plaintiff's two

4   responsive memoranda and 40 attachments, as well as considering statements made during a

5   *Loudermill* hearing at which plaintiff was present and accompanied by a union

6   representative, Superintendent Carrasco issued a written decision demoting plaintiff from

7   crew chief to journey worker "until such time as you can demonstrate that you are capable of

8   exercising good judgment and leadership."  Letter dated July 24, 2007, Exh. H to Andrade

9   Decl. (docket no. 173).  Superintendent Carrasco's ruling did not expressly mention whether

10  and for what period plaintiff would be ineligible for promotion or out-of-class assignments.

11        Meanwhile, after Ms. Kinerk had completed her initial report, but before she issued

12  her supplemental report, plaintiff again applied for a promotion.  On February 13, 2007,

13  plaintiff sought the position of Electrical Construction and Maintenance Supervisor at the

14  South Service Center.  Steinolfson Decl. at ¶ 2 (docket no. 179).  Plaintiff was one of

15  fourteen candidates interviewed on either May 17 or May 21, 2007, by a three-person panel.

16  *Id.* at ¶ 2 and Exhs. A & B.  Plaintiff was one of six finalists (and one of two women), who

17  were interviewed on either July 19 or July 23, 2007, by a different three-person panel.  *Id.* at

18  ¶ 3 and Exh. C.  Plaintiff was ranked third by the two male panelists and fourth by the

19  female panelist.  *Id.*  The panelists were not advised of the then pending disciplinary

20  investigation concerning plaintiff.  Crutchfield Decl. at ¶ 5 (docket no. 174).  On July 25,

21  2007, the two candidates receiving higher marks than plaintiff, both of whom were men,

22  were each offered a supervisor position; one of the candidates declined the offer.  *Id.* at ¶ 3.

23  Although a supervisor position therefore remained open, due to plaintiff's then recent

24  demotion, she was not eligible for the promotion.  Moralez Decl. at ¶ 8 (docket no. 176); *see*

25  Andrade Dep. at 277:1-278:25, Sheridan Decl. at 156-57 (docket no. 193) (Seattle City Light

26

1    has an unwritten policy of prohibiting out-of-class assignments and promotions for one year

2    after imposition of severe discipline such as suspension or demotion).[14]

3    **2.    Comparisons Between Plaintiff and Her Peers**

4    With regard to her claims that overtime, out-of-class assignments, and discipline have

5    been meted out in a discriminatory fashion, plaintiff has provided no statistical analysis.

6    With respect to the issue of overtime while on light duty, plaintiff requests that the Court

7

8    [14] Plaintiff alleges that EEO and Diversity Manager Branda Andrade "admitted" the unwritten policy "has been
selectively applied" to plaintiff.  Response at 30 (docket no. 199).  Plaintiff, however, has misconstrued

9    Ms. Andrade's testimony.  In her deposition, Ms. Andrade was asked whether management would view
previous discipline as a factor, but not a bar to promotion.  Andrade Dep. at 276:15-21, Exh. G to Overbey

10   Supp. Decl. (docket no. 207).  Ms. Andrade responded:

11        I don't know if I can agree with that.  And the reason that I'm having difficulty is that at the
          time the recommendation for demotion for Ms. Davis and suspension for Mr. Richards was

12        made, which, I believe, that decision was made sometime in late January/early February, there
          was the belief among management, meaning myself, Jean West, Bernie Ziemianek, Berle

13        Hardie, and Chris Heimgartner, that we had, at least an unwritten policy, or at least a practice
          of having a one-year rule, that if you have a severe discipline, like suspension or demotion, that

14        you would not be eligible for out-of-class for one year.  And because the rule is pretty -- not
          written, but it was explicit that it was one year, that that should also apply for promotions as

15        well.  So it was believed that it was a one-year prohibition.  And that evolved over time.

16   Id. at 276:22-277:11.  In response to questions about her inquiries concerning the unwritten policy,
     Ms. Andrade stated:

17

18        I spoke with -- the rule evolved from Mr. Carrasco's former, what is that title, assistant to
          superintendent, DaVonna Johnson, she's the one who first noted that it's inconsistent for one to

19        be suspended one day, and then the next week to get an out-of-class promotion.  And so I went
          to her as the source of this information, and because she was in Jorge's office, she knew of all

20        the discipline that came down at his level, which would be the serious suspensions, and where
          that has been applied.  It was specifically applied, in the first instance, for an employee by the

21        name of Lisa Chetlain.  She had been suspended for a day or two, or three.  And then I think
          within a week, an out-of-class promotion came across Ms. Johnson's desk, and DaVonna said

22        this is not right.  And that's where it evolved.

23   Id. at 277:16-278:7.  Ms. Andrade noted that another employee, named Lonnie Johnson, was also denied a
     promotion in May 2007 due to discipline the previous year, consisting of a three-day suspension.  Id. at

24   278:22-280:6.  Ms. Andrade's testimony is corroborated in part by Seattle City Light's discipline records,
     which indicate that Lisa Chetlain was suspended for one day in November 2004 for making disparaging and

25   demeaning comments in violation of workplace expectations, and that Lonnie Johnson received a three-day
     suspension in June 2006 due to an inappropriate communication exchange.  Davis Decl. at 785, 782 (docket

26   no. 192).  Thus, both instances described by Ms. Andrade occurred before plaintiff was demoted, and contrary
     to plaintiff's contention, Ms. Andrade's testimony does not support the allegation that the consequences of
     demotion were "selectively applied" to plaintiff.

ORDER - 17

1   defer ruling pursuant to Fed. R. Civ. P. 56(f).  *See* Response at 22 n.9 (docket no. 199).  The

2   City of Seattle, however, insists that plaintiff has received all documents necessary to

3   compare plaintiff's light-duty overtime hours with those of similarly situated male employees

4   and that a continuance for further discovery is not warranted.  *See* Wollett Decl. at ¶¶ 2-3 &

5   Exh. A (docket no. 208).  Plaintiff has not filed a related motion to compel discovery or

6   otherwise sought assistance in obtaining data on the subject of light-duty overtime, and the

7   Court therefore denies plaintiff's motion for continuance of the pending summary judgment

8   motions.

9       In contrast to plaintiff's complete failure to perform the type of comparisons required

10  to support a claim of discrimination, the City of Seattle has provided both tabulated data and

11  graphical displays showing that plaintiff's overtime hours, overtime earnings, and out-of-

12  class hours for the years 2004, 2005, and 2006 ranked favorably against those of male

13  counterparts.  Exhs. A, B, & C to Zimmerman Decl. (docket no. 180).  For example, in 2006,

14  only one other crew chief had more overtime hours or earnings than plaintiff; all other crew

15  chiefs, all of whom are men, had fewer overtime hours and lower overtime earnings than

16  plaintiff.  Exh. B to Zimmerman Decl.  In both prior years, plaintiff had overtime hours and

17  earnings above the average for crew chiefs; in fact, in 2005, she ran a close third (229 hours

18  as compared with 278 and 243 hours), having almost twice the amount of overtime hours as

19  the next highest crew chief (115 hours).  *Id.*

20      With regard to out-of-class opportunities, during the years 2004 through 2006, only

21  one other crew chief acquired more hours than plaintiff.  Exh. C to Zimmerman Decl.

22  (docket no. 180).  The next highest crew chief had less than one-fifth of the out-of-class time

23  (199 hours) logged by plaintiff (1174 hours) over the three-year period.  *Id.*  In 2006,

24  plaintiff had the most out-of-class hours of any crew chief, benefitting from the timing of her

25  rotation, which was during the December 2006 wind storm, resulting in out-of-class and

26  overtime earnings of $67,736.83 for a three-and-a-half-month period.  *Id.*; *see* Andrade Decl.

1    at ¶ 13 (docket no. 173).  Plaintiff has provided no contradictory data or analysis concerning

2    overtime or out-of-class assignments.

3           Moreover, in support of her claim that she has been more harshly disciplined due to

4    gender and/or sexual orientation, or perhaps in retaliation for protected behavior, plaintiff

5    merely offers anecdotal evidence, in lieu of statistical analysis.  For example, plaintiff alleges

6    that Karl Horne was not adequately punished for sleeping during his shift and for viewing

7    pornography on a work computer.  Davis Decl. at ¶¶ 191-92 & 195 (docket no. 191).

8    Mr. Horne, however, was given a Letter of Expectation, indicating that sleeping during work

9    hours was "unacceptable practice" and that a reoccurrence "could lead to disciplinary

10   action," Davis Decl. at 832 (docket no. 192), and he was issued a Verbal Warning for

11   leaving a USB flash drive containing inappropriate material[15] plugged in to a computer at the

12   South Substation and then failing, after an investigation had commenced, to disclose the

13   activity to management, Davis Decl. at 820-21.  Plaintiff offers absolutely no factual support

14   for her contention that these disciplinary sanctions were not commensurate with Mr. Horne's

15   behavior or with punishment accorded in similar circumstances.

16          Also with respect to her claim of disparate discipline, plaintiff attempts to analogize

17   the incident involving her daughter's boyfriend, Aaron Duvall, for which she was demoted,

18   with the actions of another employee who received a written reprimand.  _See_ Response at 28

19   (docket no. 199).  Plaintiff alleges that Rodney Dunlap, a journey-level worker, picked up a

20   prostitute in a City of Seattle vehicle.  Davis Decl. at ¶ 205 (docket no. 191).  An

21   investigation, however, revealed that the woman was not a prostitute, but rather a family

22   _____

23   [15] Mr. Horne's explanation for the incident was that he brought to the work site one of the many USB flash
     drives that his family shares, with the intent of using it to research a position with the City of Seattle.  Davis

24   Decl. at 818 (docket no. 192).  When he plugged in the flash drive, he opened one or two of the files, which
     contained pornographic pictures; he assumed the files belonged to his 19-year-old son and he continued using

25   the flash drive to download a web browser needed for his research.  _Id._  After conducting a forensic
     examination of the computer at issue, the investigator reported that Mr. Horne had viewed a single

26   pornographic picture on the flash drive and then had accessed a web site from which he downloaded a portable
     web browser called Torpark.  _Id._  The investigator ultimately concluded that "the custodian explanation is a
     plausible fact pattern."  Davis Decl. at 819.

1   friend, and that Mr. Dunlap saw her as he was exiting an auto parts store.  Ziemianek Dep. at

2   15:11-19, Exh. Y to Overbey Supp. Decl. (docket no. 207).  Mr. Dunlap chatted with the

3   woman for some time and then she indicated that she had missed her bus and asked for a

4   ride, which he agreed to provide.  _Id._ at 15:19-25.  Mr. Dunlap was determined to have

5   improperly used a work vehicle for personal business and to have inappropriately transported

6   a non-employee.  Heimgartner Dep. at 21:20-23, Sheridan Decl. at 171 (docket no. 193).

7   Mr. Dunlap received a reprimand.  _Id._ at 21:24-22:1.  Superintendent Carrasco was not

8   involved in the disciplinary decision.  Carrasco Decl. at ¶ 7 (docket no. 209).  Again,

9   plaintiff fails to provide any factual basis for concluding that the discipline imposed on Mr.

10  Dunlap was different from punishment previously levied in similar circumstances.

11          Plaintiff also tries to compare her transgression with Superintendent Carrasco's and

12  his wife's participation in a SeaFair parade.  _See_ Response at 28 (docket no. 199).  During

13  the parade, both Superintendent Carrasco and his wife rode on a Seattle City Light "bucket"

14  truck.  _See_ Davis Decl. at ¶ 199 (docket no. 191); Carrasco Dep. at 172:1, 20-22, Sheridan

15  Decl. at 165 (docket no. 193).  Although neither Superintendent Carrasco nor his wife were

16  wearing a harness, they were holding onto a safety bar and their feet were planted on an

17  interior platform.  Carrasco Dep. at 172:8-19, 172:23-173:6, Sheridan Decl. at 165-66.

18  Based on photographs apparently taken during the parade, plaintiff accuses Superintendent

19  Carrasco of "lying to management."  Davis Decl. at ¶ 199 (docket no. 191).  Plaintiff,

20  however, has misstated the deposition testimony and misinterpreted the photographs.  In her

21  declaration, plaintiff indicates that "Jorge testified that he held onto his wife and his wife

22  held onto a bar."  _Id._  Superintendent Carrasco, however, actually stated that "_we're_ holding

23  onto this bar . . . that's there for a reason."  Carrasco Dep. at 172:25-173:1, Sheridan Decl. at

24  165-66 (emphasis added).  The photographs corroborate Superintendent Carrasco's

25  testimony, depicting both him and his wife holding onto the safety bar with their left hands

26  and waiving to the crowd with their right hands.  Davis Decl. at 913-914 (docket no. 192).

1   Thus, the photographs do not support plaintiff's allegation of wrongdoing on the part of

2   Superintendent Carrasco.  Moreover, plaintiff offers no evidence to support her implied

3   assertions that Superintendent Carrasco's wife was improperly on the bucket truck or that the

4   absence of a harness constituted a safety violation.

5          In contrast to plaintiff's irrelevant anecdotes, a review of disciplinary decisions made

6   since Jorge Carrasco became Superintendent in early 2004 shows that plaintiff's demotion in

7   2007 and her two-day suspension in 2006 were equal to or perhaps less harsh than sanctions

8   imposed on male employees.  _See_ Davis Decl. at 779-810 (docket no. 192).  For example,

9   since March 2004, eighteen employees have been terminated or have retired or resigned in

10  lieu of termination.  _Id._ at 779-87.  All but one of these employees were male.  _Id._  Four

11  terminations were because the employees tested positive for controlled substance use.[16]  _Id._

12  With two exceptions, both of which directly or indirectly involved motor vehicles, the

13  remaining terminations were based on some combination of (i) failure to comply with

14  workplace expectations, (ii) safety violations, (iii) ethics violations, or (iv) failure to meet

15  performance standards.  _Id._  None of these terminated employees had more than two of the

16  four bases for discipline; in contrast, plaintiff's mere demotion was due to the first three of

17  the four reasons.  _Id._  Finally, at least two of these employees were terminated explicitly for

18  sexual harassment.  _Id._ at 780, 783.

19  **Discussion**

20  **A.      Motion for Reconsideration**

21         Plaintiff has moved for reconsideration of the Court's Minute Order striking portions

22  of the brief and declarations filed in response to the pending summary judgment motions.

23  Plaintiff's materials were replete with hearsay and double-hearsay, as well as speculative

24  _____

25  [16] During the period at issue, a female employee and one male employee were terminated for controlled substance use, but their terminations were converted to 30-day suspensions upon execution of a Return-To-Work ("RTW") Agreement.  Davis Decl. at 781, 782 (docket no. 192).  The other two employees terminated

26  for controlled substance use, both of whom were male, had previously been sanctioned for similar conduct and were found in violation of their respective RTW Agreements.  _Id._ at 781, 783.

statements and assertions lacking proper foundation, and the Court previously granted in part

the City of Seattle's motion to strike such items.  Minute Order (docket no. 239).  The Court

has carefully reviewed plaintiff's arguments[17] concerning the admissibility of various

statements and agrees with some of them.  The Court therefore GRANTS IN PART

plaintiff's motion for reconsideration and will include the following lines of text in the

record relating to the pending motions for summary judgment:[18]

> (1)  in Davis Decl. (docket no. 191), the averments at 30:24-25, 31:3-4,
> 33:22-24, 42:3-6 ("Ivie was creating . . . as soon as they become aware
> of it."), 44:7-8, 45:6-7, 45:10, 45:22, 46:13-14, 47:1-2, 53:14-23, 54:23-
> 24, 55:7 ("that he . . . light duty restrictions."), 55:14-15, 55:20, 56:6-7
> (no ground for objection stated by the City of Seattle), 57:16-17, 58:21-
> 23, 59:10-11, 59:15-16, 61:4-7, 62:1-3 ("have complained . . . distorted
> their statement."), 65:5-6, 68:15-16, 71:3-6 ("Management . . .
> lawsuit."), and 77:13 ("She advised . . . to HR."); and
>
> (2)  in Richards Decl. (docket no. 194), the averments at 7:20-21, 7:24-25,
> 8:5, 11:6-7, 15:23-25, and 16:1-2 ("I am . . . openly gay male").

The Court otherwise DENIES plaintiff's motion for reconsideration.

With respect to materials the Court has stricken, they generally fall within one of four

categories:  (i) evidence lacking proper foundation or authentication or otherwise specifically

barred; (ii) plaintiff's summaries or interpretations of documents or deposition testimony;

(iii) hearsay concerning matters occurring before August 28, 2003; and (iv) hearsay for

which plaintiff has failed to meet her burden of establishing an applicable exception.  Much

of plaintiff's declaration is devoted to improper speculation, but to the extent that plaintiff

merely expresses her own opinion or perception, the Court has considered her assertions.

The same is true of Mr. Richards's personal beliefs.  The Court, however, does not regard as

---

[17] Plaintiff's responses to the City of Seattle's objections are contained within comment boxes in the margins on versions of plaintiff's and Mr. Richards's declarations, which are attached to plaintiff's counsel's declaration (docket no. 242).  The comment boxes end on page 60 of plaintiff's declaration.  The Court has assumed that counsel experienced either technical difficulties or a lack of time or energy, and it has sua sponte reviewed and reconsidered some of its rulings concerning materials on pages 61 through 81 of plaintiff's declaration and in Mr. Richards's declaration.

[18] The Court uses a citation form in which the page number is followed by a colon and then the relevant line numbers.  For example, "30:24-25" means page 30 at lines 24 through 25.

ORDER - 22

1   evidence plaintiff's quotations from documents or her characterizations of deposition

2   testimony.  The written materials and transcripts speak for themselves.  *See* Fed. R. Evid.

3   1002.  To be clear, although the Court has stricken plaintiff's often inaccurate recitations of

4   statements made by various witnesses, the Court has thoroughly reviewed the deposition

5   transcripts, portions of which were provided by the City of Seattle and portions of which

6   were attached to the declaration of plaintiff's counsel.  In addition, to the extent that

7   documents were not rendered inadmissible for other reasons, for example pursuant to Fed. R.

8   Evid. 408 or Fed. R. Evid. 901, the Court has considered them.

9           As to the bulk of the hearsay statements at issue, plaintiff contends they are

10  admissible because the declarant is a "speaking agent" for Seattle City Light.  Plaintiff cites

11  to Fed. R. Evid. 801(d)(2)(D), which defines a statement as non-hearsay if it is offered

12  against a party and it was made by that party's agent, during the agency relationship,

13  concerning a matter within the scope of the agency.  As the proponent of the evidence,

14  plaintiff bears the burden of laying an adequate foundation.  *See* *Breneman v. Kennecott*

15  *Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (under Rule 801(d)(2)(D), the proffering party

16  must "show than an otherwise excludible statement relates to a matter within the scope of the

17  agent's employment").  The mere fact that a person is an officer, manager, or supervisor does

18  not itself imply that he or she has authority to speak for the employer concerning the subject

19  at hand.  *See* Hon. Robert S. Hunter, FEDERAL TRIAL HANDBOOK: CIVIL § 59:4 at 742 (4th

20  ed. 2007) (citing 29A AM. JUR. 2d *Evidence* § 822); *see also* *Selby v. Pepsico, Inc.*, 784 F.

21  Supp. 750, 757 (N.D. Cal. 1991) (excluding a hearsay statement of Pepsico's Senior Vice

22  President for Human Resources because the proponent failed to lay an adequate foundation),

23  *aff'd* 994 F.2d 703, 705 (9th Cir. 1993) (noting contrary authority, but concluding that any

24  error was harmless).  Indeed, in the employment discrimination context, courts addressing

25  the issue have held that statements concerning the reasons for an adverse employment action

26  are admissible under Rule 801(d)(2)(D) only if the declarant was involved in the decision.

1   *See Taylor v. Battelle Columbus Labs.*, 680 F. Supp. 1165, 1171 (S.D. Ohio 1988)

2   ("statements made concerning the reasons for an employee's discharge are within the scope

3   of the speaker's employment *only* if the speaker was involved in the discharge decision")

4   (emphasis in original) (citing *Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir. 1983))); *see*

5   *also Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 n.2 (7th Cir. 2003) ("the

6   declarant must be involved in the decisionmaking process" (quoting *Aliotta v. Nat'l R.R.*

7   *Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003))).

8          With regard to hearsay statements of plaintiff's various direct supervisors, the Court

9   has assumed that plaintiff could (although she has not on this record) establish that the

10  instructions or comments at issue were made within the scope of their employment.  Thus, as

11  to most of the statements attributed primarily to Bill Ivie, Frank Young, and Paul Weintraub,

12  the Court either did not initially strike them or has revised its earlier ruling.  Concerning

13  hearsay statements of co-workers, subordinates, or managers outside plaintiff's "chain of

14  command," plaintiff fails to provide any evidence that such comments fall within the ambit

15  of Rule 801(d)(2)(D).  Moreover, to the extent these or other utterances involve events

16  before August 28, 2003, they are otherwise inadmissible as irrelevant in light of the Court's

17  contemporaneous ruling on the effect of the Statute of Limitations.  Finally, because the

18  parties have focused so heavily on a hearsay statement purportedly made by Patty Eng, the

19  Court specifically addresses its exclusion.

20         In her declaration, plaintiff alleged Patty Eng told her that Ms. Eng heard at a meeting

21  the reason plaintiff was not promoted in 2004 was because "the Line Crews were not ready

22  for a Lesbian Supervisor."  Davis Decl. at ¶ 113 (docket no. 191).  Patty Eng had been an

23  Electrical Construction and Maintenance Supervisor, a peer to the position for which

24  plaintiff applied in 2004; Ms. Eng retired from Seattle City Light in May 2006, and she

25  passed away on October 9, 2006.  West Decl. at ¶ 6 (docket no. 213).  Plaintiff has offered

26  no evidence that Ms. Eng participated in the decision not to promote her or that Ms. Eng had

1  the authority to discuss or express views about the promotional process.  *See* *Young*, 327

2  F.3d at 623 (Rule 801(d)(2)(D) is premised on the assumption that those having the requisite

3  authority are inhibited by such relationship and responsibility "from making erroneous or

4  underhanded comments" that could harm the employer).  Therefore, plaintiff may not treat

5  Ms. Eng's alleged statements as admissions by a party-opponent.  Moreover, even if Ms. Eng

6  were considered a "speaking agent," the discussion attributed to Ms. Eng merely recounts

7  hearsay, the source of which is unknown and unknowable.  Because Ms. Eng has passed

8  away, the statements at issue cannot be tested through the crucibles of deposition or cross-

9  examination, and this type of unreliable proffer represents exactly what the Rules of

10  Evidence were designed to exclude.

11  **B.**      **<u>Summary Judgment Standard</u>**

12           The Court must grant summary judgment if no genuine issue of material fact exists

13  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

14  moving party bears the initial burden of demonstrating the absence of a genuine issue of

15  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it

16  might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby,*

17  *Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving

18  party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving

19  party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict

20  in favor of the opponent, *Anderson*, 477 U.S. at 249.

21           When a properly supported motion for summary judgment has been presented, the

22  adverse party "may not rely merely on allegations or denials" in its pleadings.  Fed. R. Civ.

23  P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence

24  of a genuine issue for trial.  *Id.*; *Anderson*, 477 U.S. at 256.  A party cannot create a genuine

25  issue of fact by simply contradicting his or her own previous sworn statement, *Cleveland v.*

26  *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), or by asserting "some metaphysical

1   doubt" as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

2   574, 586 (1986).  Likewise, discrediting the testimony proffered by the moving party will not

3   usually constitute a sufficient response to a motion for summary judgment.  *Anderson*, 477

4   U.S. at 256-57.

5          To survive a motion for summary judgment, the adverse party must present

6   "affirmative evidence," which "is to be believed" and from which all "justifiable inferences"

7   are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole,

8   "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is

9   warranted.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see*

10  *also Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006) ("Rule 56(c) 'mandates the entry of

11  summary judgment, after adequate time for discovery and upon motion, against a party who

12  fails to make a showing sufficient to establish the existence of an element essential to that

13  party's case, and on which that party will bear the burden of proof at trial'" (quoting *Celotex*,

14  477 U.S. at 322)).

15  **C.     Settlement Agreement**

16         The City of Seattle moves for summary judgment with regard to all claims based on

17  events occurring before December 22, 1995, the date plaintiff's previous lawsuit was

18  resolved via settlement.  *See* Settlement Agreement and Release, Exh. A to Overbey Decl.

19  (docket no. 178).  Plaintiff does not offer much objection beyond needlessly recounting the

20  facts underlying the earlier litigation.  In fact, plaintiff appears to concede the issue,

21  indicating in her brief that her hostile work environment claim begins, "for liability purposes,

22  once she settles her first discrimination law suit."  Response at 35 (docket no. 199).  Thus,

23  the Court GRANTS summary judgment in favor of the City of Seattle with respect to causes

24  of action based on incidents predating the 1995 settlement.

25

26

1    **D.**     <u>**Statute of Limitations**</u>

2          The City of Seattle also moves for summary judgment with respect to claims accruing

3    more than three years and sixty days before plaintiff filed this action.  Plaintiff instituted this

4    suit in King County Superior Court on October 27, 2006.  Exh. A to Notice of Removal

5    (docket no. 1).  The statute of limitations for claims brought under the Washington Law

6    Against Discrimination ("WLAD") is three years.  <u>*Antonius v. King County*</u>, 153 Wn.2d 256,

7    261-62, 103 P.3d 729 (2004); <u>*see*</u> RCW 4.16.080(2) (action for personal injury must be

8    commenced within three years).  The statute of limitations applicable to plaintiff's claims

9    under 42 U.S.C. § 1983 is also three years.  <u>*RK Ventures, Inc. v. City of Seattle*</u>, 307 F.3d

10   1045, 1058 (9th Cir. 2002).  The statute of limitations is tolled during the sixty-day period of

11   mandatory presentment to a local governmental entity.  <u>*See*</u> RCW 4.96.020(4).  Thus, the

12   relevant date for purposes of the statute of limitations analysis in this case is August 28,

13   2003.  The City of Seattle argues that all causes of action based on discrete acts occurring

14   before this date are time barred.

15          Plaintiff responds by invoking the "continuing violation" doctrine.  Prior to the United

16   States Supreme Court's opinion in <u>*Nat'l R.R. Passenger Corp. v. Morgan*</u>, 536 U.S. 101

17   (2002), and the Washington Supreme Court's opinion in <u>*Antonius v. King County*</u>, 153

18   Wn.2d 256, 103 P.3d 729 (2004), Washington courts applied the continuing violation

19   doctrine as an equitable exception to the statute of limitations for claims brought under the

20   WLAD.  Under the continuing violation doctrine, qualifying violations could be either

21   systemic or serial.  <u>*Antonius*</u>, 153 Wn.2d at 262.  Systemic violations were those rooted in a

22   discriminatory policy or practice; if the policy or practice continued into the limitations

23   period (the three years predating the filing of suit), the plaintiff's claim was deemed timely.

24   <u>*Id.*</u>

25          Serial violations were those involving a chain of similar discriminatory acts emanating

26   from the same discriminatory animus; if at least one violation occurred during the limitations

1   period, that violation anchored the earlier ones, and the plaintiff could recover for all

2   discriminatory actions. *Id.* Washington courts employed a three-part test for assessing

3   whether a plaintiff could establish a serial violation: (i) whether the alleged acts involved the

4   same type of discrimination tending to connect them in a continuing violation; (ii) whether

5   the alleged acts were recurring; and (iii) whether the untimely sued upon acts had the degree

6   of permanence that should have triggered the employee's awareness of and duty to assert his

7   or her rights. *Id.* at 262-63.

8       In *Antonius*, the Washington Supreme Court adopted the new standard set forth in

9   *Morgan*, but only as to hostile work environment claims. Under the *Morgan/Antonius*

10  standard, the acts contributing to the hostile work environment are treated as one unlawful

11  employment practice. *Id.* at 264. Under this analysis, the plaintiff's claim is timely filed as

12  long as one of the acts at issue occurred during the limitations period. *Id.* at 266. The

13  plaintiff would then be entitled to recover for all acts designated as part of the unlawful

14  employment practice. *See id.* In reaching its decision in *Antonius*, the Washington Supreme

15  Court specifically rejected the third-prong of the serial violation test, stating that hostile work

16  environment claims are not subject to any "discovery rule" of accrual, and denouncing the

17  notion that the statute of limitations begins to run for such claims whenever a plaintiff has

18  "notice of harm, however slight." *Id.* at 269. The Washington Supreme Court indicated that

19  underlying its opinion was the broad scope of the WLAD and its desire to liberally construe

20  the statute to accomplish the legislative purpose. *Cf. id.* at 267 (observing that federal case

21  law is generally rejected when it limits remedies, but adopted when it provides the potential

22  for greater recovery).

23      Under the *Morgan/Antonius* rule, the Court's task is "to determine whether the acts

24  about which an employee complains are part of the same actionable hostile work

25  environment practice, and if so, whether any act falls within the statutory time period." *Id.* at

26  271. To constitute one actionable unlawful employment practice, the various acts "must

1   have some relationship to each other." *Id.*  Intervention by an employer can destroy the

2   connection between earlier and later acts.  *Id.*  Moreover, discrete acts, such as termination,

3   failure to promote, denial of transfer, or refusal to hire, cannot qualify as related acts, and

4   therefore, are not cognizable unless occurring within the limitations period.  *Id.* at 264 (citing

5   *Morgan*, 536 U.S. at 108-13).

6        Here, plaintiff attempts to group into one claim of hostile work environment various

7   discrete acts, such as the decisions not to promote her in 1998 and 2002, which she claims

8   were based on gender discrimination and retaliation for her 1994 lawsuit, respectively, the

9   verbal warning and written confirmation issued by Joe Bell in 2001 and the subsequent

10  refusal to remove it from plaintiff's file, and the 2001 transfer from the Electrical Shop to the

11  South Substation.  Each of these acts, however, had the requisite "degree of permanence" to

12  trigger plaintiff's duty to assert her rights, and she will not now be permitted to use either the

13  *Morgan/Antonius* hostile work environment rubric or the serial continuing violation doctrine

14  to circumvent the three-year statute of limitations.  Moreover, even if the Court were to

15  assume plaintiff was subjected to harassment on account of gender and/or sexual orientation

16  during her tenure under Joe Bell, after plaintiff transferred to the South Substation, she was

17  never again supervised by Mr. Bell, and the "intervention" exercised by Ms. Smith-Graham,

18  who persuaded plaintiff to voluntarily change positions, effectively severed the relationship

19  between Mr. Bell's behavior and any hostile or harassing actions occurring within the

20  limitations period.  Thus, the Court GRANTS summary judgment in favor of the City of

21  Seattle with respect to all claims based on acts occurring prior to August 28, 2003.

22  **E.    Merits of Plaintiff's Claims**

23          **1.    Disparate Treatment and Retaliation**

24       Plaintiff's remaining disparate treatment and retaliation claims fall within one of three

25  categories:  (i) unsuccessful bids for promotion; (ii) discipline; and (iii) allegedly

26  discriminatory assignments.  To defeat the pending motions for summary judgment, plaintiff

ORDER - 29

must, at a minimum, establish a prima facie case of either disparate treatment or retaliation. *See Hines v. Todd Pac. Shipyards Corp.*, 127 Wash. App. 356, 370-71, 112 P.3d 522 (2005) ("Washington courts have adopted the *McDonnell Douglas/Burdine* three-part burden allocation framework for disparate treatment cases." (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)); *see also Tyner v. Dep't of Soc. & Health Servs.*, 137 Wn. App. 545, 564, 154 P.3d 920 (2007) (the *McDonnell Douglas/Burdine* "burden shifting scheme also applies to retaliation claims").

To present a prima facie case of disparate treatment, plaintiff must prove that (i) she is a member of a protected class, (ii) she was treated less favorably than a similarly situated non-protected employee, and (iii) the non-protected employee was doing the same work. *See Clarke v. Office of the Attorney Gen.*, 133 Wn. App. 767, 788-89, 138 P.3d 144 (2006).  To make out a prima facie case of retaliation, plaintiff must establish that (i) she engaged in statutorily protected activity, (ii) Seattle City Light and/or Jorge Carrasco took some adverse employment action against her, and (iii) a causal link exists between the protected activity and the adverse action.  *See Tyner*, 137 Wn. App. at 563.

Only if plaintiff presents sufficient evidence of a prima facie case does the burden shift to Seattle City Light and Superintendent Carrasco to provide evidence of legitimate, nondiscriminatory reasons for their actions.  *See id.* at 563-64; *see also Hines*, 127 Wn. App. at 371.  The final burden rests on plaintiff to produce evidence that the asserted reasons are merely a pretext.  *See Hines*, 127 Wn. App. at 371.  To establish pretext, plaintiff must put forward specific evidence indicating that the articulated nondiscriminatory reasons are "unworthy of belief."  *See id.* at 372.  "Speculation and belief are insufficient to create a fact issue as to pretext.  Nor can pretext be established by merely conclusory statements of a plaintiff who feels that he has been discriminated against."  *Id.* (quoting *McKey v. Occidental Chem. Corp.*, 956 F. Supp. 1313, 1319 (S.D. Tex. 1997)).  Moreover, summary judgment

1  may be granted in favor of an employer even when the employee has created a weak issue of

2  fact concerning pretext, if abundant, uncontroverted, independent evidence indicates that no

3  discrimination or retaliation occurred.  *See* *Tyner*, 137 Wn. App. at 564 (quoting *Milligan v.*

4  *Thompson*, 110 Wn. App. 628, 637, 42 P.3d 418 (2002) (quoting *Reeves v. Sanderson*

5  *Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

6  ### a.   <u>Unsuccessful Bids for Promotion</u>

7  Plaintiff fails to present any admissible evidence that the decisions in 2004 and 2007

8  not to promote her were based on sexual orientation, gender, or her previous lawsuit or

9  internal complaints.  With regard to the unsuccessful bids for promotion, the Court has

10  assumed that plaintiff can establish a prima facie case.  In both instances, however,

11  candidates scoring higher than plaintiff during the final interviews were offered the positions.

12  In light of the nondiscriminatory reason for the selection of other applicants over plaintiff,

13  she now bears the burden of demonstrating pretext.  Plaintiff, however, offers nothing more

14  than speculation and conjecture.

15  As to sexual orientation, plaintiff provides no evidence that such immutable

16  characteristic was known or considered in the decision-making process.  To the contrary, of

17  the two panelists for the final round in 2004, one of them, Rod Siverson, was not even aware

18  that plaintiff is homosexual, and the other has declared under oath that he does not think

19  sexual orientation is relevant to hiring decisions, Harris Decl. at ¶ 5 (docket no. 175).

20  With respect to gender, plaintiff's evidence of pretext is equally nonexistent.  In 2004,

21  plaintiff was the only woman applicant; she was selected as one of five finalists, while fifty

22  percent of the male candidates did not receive a second interview.  The two men who

23  received promotions were ranked higher than plaintiff by five of the six initial panelists and

24  by second-round evaluator John Harris.

25  In 2007, plaintiff was one of at least two women applicants, and she was one of two

26  women among the six finalists, while over fifty-seven percent of the initial candidates, most

of whom were male, did not make the second round.  The two men who were offered supervisor positions were ranked higher than plaintiff by all three panelists for the final round.  Plaintiff received a lower rating from the one female panelist than from the two male panelists.

These uncontroverted events and statistics evidence a gender-neutral, or perhaps even a female-biased, selection process.  While fifty or more percent of the men who applied were eliminated after the first round, all or most of the women candidates passed to the second round.  Plaintiff offers no evidence that the second round scores were affected by gender; in fact, plaintiff was consistently rated higher than fifty percent of the male finalists.  Moreover, plaintiff does not even allege that interviews were administered in a gender-biased manner or that any inappropriate gender-based comments were made by anyone involved.  Finally, plaintiff provides no basis for disbelieving Seattle City Light's nondiscriminatory reason for not promoting her; if Seattle City Light actually wanted to rig the selection process against plaintiff, it presumably would not have rated her as highly or advanced her to the final round each time.[19]

---

[19] In 2005, based on the advice of external consultants, Superintendent Carrasco required all incumbent directors and deputy superintendents to apply for equivalent positions under a different organizational structure.  Carrasco Decl. at ¶ 6 (docket no. 209).  Plaintiff asserts that this decision constitutes evidence of discrimination against women and homosexuals.  Plaintiff alleges that two of the incumbents who lost positions as a result of the reorganization were homosexual, but she offers insufficient factual support.  See Response at 16-17 (docket no. 199) (citing Tobin Dep. at 25:5-10, Sheridan Decl. at 505 (docket no. 193) (indicating that Dana Backiel was a homosexual woman and a member of the incumbent "executive team," but providing no information about Ms. Backiel's position after the reorganization, and not identifying any other homosexual member of the incumbent executive team)).  Plaintiff likewise offers no details concerning the number of directors and deputy superintendents or the number of men and women, respectively, affected by the restructuring.  Plaintiff instead relies primarily on the experiences of Dr. Tobin, who lodged complaints of gender-based discrimination and harassment against Superintendent Carrasco, which were investigated by Lawton Humphrey, a partner at Davis Wright Tremaine LLP, and found to be unwarranted.  See Letter by Deputy Mayor Tim Ceis dated February 16, 2006, Exh. W to Overbey Supp. Decl. (docket no. 207).  Dr. Tobin's testimony, however, does not even help plaintiff.  When asked in her deposition who ultimately assumed her position, Dr. Tobin answered, "They rearranged everything and created a new position, so that's a difficult question to answer."  Tobin Dep. at 26:5-6, Sheridan Decl. at 506.  In addition, after explaining that incumbents either obtained a new executive position, were demoted, or left Seattle City Light, in response to

1    Finally, concerning retaliation, plaintiff fails to meet her burden to show pretext.

2  Plaintiff does not dispute that none of the 2007 interviewers were advised of the then

3  pending investigation concerning the assistance plaintiff rendered to Aaron Duvall.

4  Moreover, plaintiff offers no evidence that any of the panelists in 2004 or 2007 knew of her

5  1994 lawsuit or other complaints.  Although plaintiff presents ample evidence that Paul

6  Weintraub was aware of her prior litigation, Mr. Weintraub's involvement in the promotional

7  process was minimal; he did not participate in the 2004 interviews, and his role in the 2007

8  process was simply to ensure that candidates met the qualifications for the position.  *See*

9  Weintraub Decl. at ¶ 2 (docket no. 212); Crutchfield Decl. at ¶¶ 2-3 (docket no. 174).

10  Mr. Weintraub retired approximately seven months before the 2007 interviews commenced.

11  Weintraub Decl. at ¶ 1 (retired in October 2006); Steinolfson Decl. at ¶ 2 (docket no. 179)

12  (first round of interviews were in May 2007).  Thus, with respect to plaintiff's unsuccessful

13  attempts at promotion, the Court concludes that no issue of fact concerning pretext exists,

14  and the Court GRANTS summary judgment in favor of the City of Seattle and Jorge

15  Carrasco as to the claims of discrimination and retaliation related thereto.

16                    **b.    Discipline**

17    With regard to the discipline she received in 2006 and 2007, plaintiff fails to present a

18  prima facie case of either discrimination or retaliation.  As an initial matter, plaintiff accuses

19  both Kathleen O'Hanlon[20] and Colleen Kinerk of being biased and/or deficient as

20  investigators.  She does not, however, contest the basic factual findings, namely that plaintiff

21  _____

22  plaintiff's counsel's leading question, "you felt like this was happening more to women than to men," Dr. Tobin
   responded, "Oh, it happened to most everybody."  Tobin Dep. at 34:4-6, Sheridan Decl. at 512.  Thus, even if
23  relevant, the proffered evidence does not draw the requisite link between the restructuring and either gender or
   sexual orientation.

24  [20] Sometime after completing her investigation of Karl Horne's complaint, Ms. O'Hanlon was offered a
   position in the Seattle City Attorney's Office.  Fleming Reed Dep. at 20:14-23:10, Sheridan Decl. at 455-58
25  (docket no. 193).  To the extent plaintiff is alleging that Ms. O'Hanlon participated in some scheme to attack
   her for the purpose of obtaining employment in a different municipal agency, plaintiff's accusation lacks
26  credibility because Ms. O'Hanlon actually exonerated plaintiff of the most serious of Mr. Horne's complaints,
   namely hostile work environment and discrimination based on disability, gender, race, and sexual orientation.

1   drafted but then arranged for subordinates to sign Karl Horne's apprenticeship evaluation,

2   that plaintiff conducted an expectations meeting with Mr. Horne in advance of his rotation,

3   and that plaintiff, without approval from a supervisor, allowed non-employee Aaron Duvall

4   to enter the South Substation and climb a steel structure in preparation for an apprenticeship

5   test, while serving as the "safety watch person."  Thus, whether Ms. O'Hanlon and/or

6   Ms. Kinerk conducted neutral and competent investigations is not the relevant inquiry.

7          The question is whether, in light of plaintiff's undisputed behavior, she was punished

8   more severely than men, heterosexuals, or non-litigants engaging in similar conduct.

9   Plaintiff does not present any statistical evidence that would yield a response in her favor.

10  The only evidence before the Court shows that, while Jorge Carrasco has been

11  Superintendent of Seattle City Light, male employees have suffered harsher penalties for

12  comparable or less egregious conduct.  Moreover, at least with respect to the two-day

13  suspension in 2006, plaintiff has failed to establish that the decision-maker was even aware

14  of her 1994 lawsuit or prior complaints.  *See* Carrasco Decl. at ¶¶ 5 & 7 (when imposing the

15  two-day suspension, Superintendent Carrasco was "unaware of her prior litigation" and he

16  was not involved "in any discussion of possible discipline against Bill Ivie").  Thus, the

17  Court GRANTS summary judgment in favor of the City of Seattle and Jorge Carrasco with

18  respect to disparate treatment claims relating to discipline imposed upon plaintiff and with

19  respect to retaliation claims based on the two-day suspension in 2006; plaintiff has not

20  presented a prima facie case for such claims.

21         Plaintiff's only remaining claims involving discipline concern her demotion in 2007

22  and the consequences flowing therefrom.  With respect to the demotion, even if plaintiff is

23  presumed to have presented a prima facie case of retaliation, the adverse decision rests on a

24  legitimate, non-retaliatory ground, and plaintiff must present some evidence that the

25  articulated basis for demotion is "unworthy of belief."  *See Hines*, 127 Wn. App. at 372.

26  Plaintiff has not done so.  Her 1994 lawsuit is far too remote in time to have played a role in

ORDER - 34

the demotion decision.  The currently pending case is more proximate, but standing alone, it does not undermine the earnestness of the explanation for the demotion.  Plaintiff does not dispute the wrongdoing that led to the demotion, and she offers no evidence that similar behavior by employees not engaging in protected activity has been less harshly punished.  Although the anonymous complaint that launched the investigation at issue did appear shortly after plaintiff filed this lawsuit, no retaliatory motive can be inferred from the timing because the anonymous author is obviously not a party to this action.  Finally, if anything, the evidence supports a conclusion that plaintiff has been more favorably treated, perhaps due to her previous complaints and current litigation, than otherwise warranted; employees with equivalent or less severe misbehavior have been terminated, not merely demoted, and at least one crew chief has opined that "he would have been fired" had he done what plaintiff did, _see_ Supp. Report at 14, Exh. G to Andrade Decl. (docket no. 173).

With respect to the unwritten policy prohibiting promotion and out-of-class assignments for one year following substantial discipline, plaintiff likewise fails to support her claims.  As an initial matter, the Court observes that the policy appears facially reasonable; the punitive effect of a demotion would be nullified by promoting or allowing the disciplined employee to work out-of-class.  Moreover, plaintiff's allegation that the policy has been "selectively applied" to her lacks any factual basis.  As an attempt to contradict the examples described by EEO and Diversity Manager Branda Andrade, in which the policy was applied to deny promotion to other employees, plaintiff asserts that Ed Kefgen, described by plaintiff as a heterosexual male, has been allowed to work out-of-class despite recent discipline.  Response at 30 (docket no. 199).  In response, the City of Seattle has proffered the declaration of Bernard Ziemianek, the Director of Energy Delivery Operations for Seattle City Light.  _See_ Ziemianek Decl. at ¶ 1 (docket no. 214).  According to Mr. Ziemianek, Mr. Kefgen received a one-day suspension in March 2007 for an incident in June 2006 during which he was involved in a "minor 'shoving match' with another

1    employee." _Id._ at ¶¶ 3-4.  As a result of the discipline, and after consultation with Human

2    Resources Officer Jean West, Mr. Kefgen was deemed ineligible for permanent placement as

3    a Crew Chief Coordinator, which would have been a promotion for him.  _Id._ at ¶¶ 3 & 5; _see_

4    _also_ West Decl. at ¶ 3 (docket no. 213).  Mr. Ziemianek further explained that this decision

5    would not have been discussed with plaintiff, who is a peer to Mr. Kefgen, and whatever

6    information plaintiff has on the subject might not accurately reflect the views of

7    management.  Ziemianek Decl. at ¶ 5.  Thus, with respect to the denial of promotion

8    following discipline, plaintiff has not shown that the unwritten policy was applied in a

9    discriminatory or retaliatory manner.

10           Based on the wording of Mr. Ziemianek's and Ms. West's declarations, however, the

11   Court must draw an inference in favor of plaintiff that, despite his earlier suspension,

12   Mr. Kefgen continues to receive out-of-class (temporary) assignments as Crew Chief

13   Coordinator.  Even if true, such fact does not support plaintiff's claim of disparate treatment

14   or retaliation with regard to post-demotion temporary out-of-class assignments.  Mr. Kefgen

15   received only a one-day suspension; he was not demoted.  Plaintiff provides no evidence that

16   other employees who were demoted received more favorable treatment due to gender, sexual

17   orientation, or absence of protected activities.  Moreover, plaintiff offers no evidence that

18   she has requested and been denied any out-of-class assignments since her demotion.[21]  She

19   has therefore failed to even allege the adverse employment action that constitutes an element

20   of her prima facie case.  The Court therefore GRANTS summary judgment in favor of the

21   City of Seattle and Jorge Carrasco as to plaintiff's retaliation claim relating to her 2007

22   demotion and as to her disparate treatment and retaliation claims involving the unwritten

23

24

25   [21] Plaintiff concedes that, for purposes of RCW Chapter 4.96, which requires pre-litigation administrative filing
     of a claim against a municipality, any events occurring after August 20, 2007, are outside the scope of this
26   action.  Response to Motions in Limine at 24 (docket no. 235).  Thus, plaintiff cannot litigate in this case any
     claims relating to the denial of out-of-class opportunities after August 20, 2007.

1   policy prohibiting promotion and out-of-class assignments for one year following severe

2   discipline.

4             **c.**    **Allegedly Discriminatory Assignments**

5          Plaintiff provides no statistical analysis to support her claim that overtime and out-of-

6   class assignments were distributed in a discriminatory manner.  The only evidence before the

7   Court demonstrates that plaintiff's overtime and out-of-class hours compared favorably with

8   those of her male peers.  In addition, plaintiff offers no factual basis for her claim that

9   homosexuals were segregated onto her crew.  Plaintiff does not even provide information

10  concerning the number, gender, or sexual orientation of journey-level workers on her crew at

11  various points in time.[22]  More to the point, though, plaintiff cannot possibly show that every

12  homosexual (or even the majority of homosexuals) within the organization is (are) located on

13  her crew of just three or four journey-level workers.  Neither statistical probability nor the

14  bounds of decency and legitimate discovery will assist plaintiff in this regard.  *See* Minute

15  Order (docket no. 36) (granting the City of Seattle's motion for protective order in

16  connection with plaintiff's interrogatory asking to identify "every employee who is gay," and

17  ruling that the City of Seattle is not required to ascertain or disclose the sexual orientation of

18  employees).  Thus, the Court GRANTS summary judgment in favor of the City of Seattle

19  and Jorge Carrasco with regard to plaintiff's discriminatory assignments claims.

20         **2.**    **Hostile Work Environment**

21         Plaintiff attempts to transmute her various disparate treatment claims into one hostile

22  work environment claim.  Plaintiff may not do so.  Discrete acts, such as refusal to promote,

23  denial of transfer, suspension, demotion, are independently actionable, and they may not be

24  cobbled together into a harassment claim.  *See Antonius*, 153 Wn.2d at 264; *see also*

---

26  [22] At least for some period, plaintiff's crew consisted of Rick Marino, a heterosexual male, and Edward Richards.  Davis Decl. at ¶ 81 (docket no. 191).

1    _Morgan_, 536 U.S. at 113 ("discrete discriminatory acts are not actionable if time barred,

2    even when they are related to acts alleged in timely filed charges").  Indeed, were the Court

3    to accept plaintiff's view, then the hostile work environment rubric would serve no purpose;

4    it stands in contrast to discrete acts of discrimination or retaliation, and it operates in

5    circumstances when an independent act is not sufficient to cause distress, but a series of

6    similar or related acts is intolerable.  Thus, for purposes of plaintiff's hostile work

7    environment claim, the Court restricts its analysis to the allegedly harassing behavior of Bill

8    Ivie, plaintiff's supervisor from November 2004 until July 2006.

9         To prove a claim of hostile work environment, plaintiff must establish that the

10   harassment at issue (i) was unwelcome, (ii) was due to her membership in a protected class,

11   (iii) affected the terms and conditions of her employment, and (iv) was imputable to her

12   employer.  _See Clarke_, 133 Wn. App. at 785.  To satisfy the third element, the harassment

13   must be "sufficiently pervasive so as to alter her employment conditions" and the conduct

14   must be more than merely offensive.  _Id._  Plaintiff offers no evidence to contradict Branda

15   Andrade's conclusion that Mr. Ivie did not discriminate against plaintiff in making overtime

16   and out-of-class assignments; thus, the only acts upon which plaintiff can base her hostile

17   work environment claim are Mr. Ivie's episodes of shouting.[23]  Plaintiff, however, provides

18   no indication that Mr. Ivie's words were themselves derogatory, offensive, or sexual in

19   nature, or even that the verbal abuse occurred more than occasionally.  Thus, plaintiff has

20   failed to meet her burden of showing pervasive and more than merely offensive conduct.

21        Moreover, plaintiff cannot hold Seattle City Light or Superintendent Carrasco

22   responsible for Mr. Ivie's actions.  Before an employee's actions are imputed to the

23   employer, a plaintiff must demonstrate that the employer (1) authorized, knew, or should

24   have known of the harassment, and (2) failed to take reasonably prompt and adequate

25   _____

26   [23] Ms. Andrade determined that Mr. Ivie yelled equally at men and women.  Although such finding would itself defeat plaintiff's hostile work environment claim, the Court does not rely on this "equal opportunity harasser" theory in deciding this case.

corrective action.  <u>*Washington v. Boeing Co.*</u>, 105 Wn. App. 1, 11, 19 P.3d 1041 (2000).
Here, after plaintiff lodged a written complaint, Seattle City Light investigated the matter and
issued a report indicating that Mr. Ivie's communication style was inappropriate.  Although
Mr. Ivie was not disciplined due to his retirement, plaintiff offers no factual support for her
contention that Ms. Andrade intentionally delayed issuing her report, or for her accusations
of bias against Ms. Andrade.[24]  Plaintiff offers no plausible motive for Ms. Andrade to delay
or to skew her investigation in favor of Mr. Ivie.  Even the disaffected Stephanie Lieberman,
who appears to share plaintiff's hostility toward the current Seattle City Light administration,
indicated that, during her tenure as EEO Coordinator, she never received pressure to make
findings favorable to management.  Plaintiff presents no basis for second-guessing Seattle
City Light's conclusion that discipline against Mr. Ivie was pointless, and she proffers no
grounds for holding Seattle City Light or Jorge Carrasco liable for Mr. Ivie's actions.  Thus,
the Court GRANTS summary judgment in favor of the City of Seattle and Jorge Carrasco
with respect to plaintiff's hostile work environment claim.

       **3.**      <u>**Section 1983 Claims**</u>

      In this context, to establish a violation of 42 U.S.C. § 1983, plaintiff must prove that
Seattle City Light and/or Jorge Carrasco acted with the intent to discriminate.  <u>*See Sischo-*</u>
<u>*Nownejad v. Merced Cmty. Coll. Dist.*</u>, 934 F.2d 1104, 1112 (9th Cir. 1991); <u>*see also*</u>
<u>*Firefighters Local Union No. 1784 v. Stotts*</u>, 467 U.S. 561, 583 n.16 (1984) (relief is
authorized under Section 1983 only when intentional discrimination has been proven or
admitted).  In failing to demonstrate disparate treatment or retaliation under the WLAD,[25]

---

[24] Plaintiff accuses Ms. Andrade of having a conflict of interest because she was formerly an associate at
Perkins Coie LLP during the time the law firm represented the City of Seattle in a discrimination case brought
by other Seattle City Light employees.  Response at 24 (docket no. 199).  Plaintiff cites to no Rule of
Professional Conduct that would define Ms. Andrade's employment by a client she previously represented as a
conflict of interest.

[25] Plaintiff asserted that Jorge Carrasco was individually liable pursuant to both the WLAD's aiding and
abetting provision, RCW 49.60.220, and Section 1983.  Plaintiff also raised claims under the Seattle Municipal
Code.  In light of the Court's rulings on the causes of action brought under the WLAD, the Court also

ORDER - 39

1  plaintiff has necessarily not met the purposeful discrimination requirement for a

2  Section 1983 claim based on equal protection.  *See Sischo-Nownejad*, 934 F.2d at 1112

3  (citing *Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161-62 (2d Cir. 1981)).

4  The Court therefore GRANTS summary judgment in favor of the City of Seattle and Jorge

5  Carrasco with regard to plaintiff's claims under Section 1983.

6  **Conclusion**

7      For the foregoing reasons, the Court GRANTS both pending motions for summary

8  judgment.  Judgment shall be entered forthwith in favor of the City of Seattle and Jorge

9  Carrasco.

10      IT IS SO ORDERED.

11      DATED this 22nd day of January, 2008

12                                              Thomas S. Zilly

13                                              Thomas S. Zilly
                                                United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26
_____

GRANTS summary judgment against plaintiff on the individual claims against Jorge Carrasco and the claims based on municipal law.

ORDER - 40